## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **CONSTANCE WESTFALL,** | § | **CIVIL ACTION NO.** |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **4:15-cv-00874-O** |
| | § | |
| **JOSE LUNA, NATHANIEL** | § | |
| **ANDERSON, VENESSA TREVINO** | § | |
| **CHRIS MELTON, AND THOMAS** | § | |
| **ROBERSON, in their individual** | § | |
| **capacities, and THE CITY OF** | § | |
| **SOUTHLAKE,** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff CONSTANCE WESTFALL brings this 42 U.S.C. § 1983 excessive force and false arrest lawsuit against Southlake Police Department Officers JOSE LUNA, NATHANIEL ANDERSON, VENESSA TREVINO, CHRIS MELTON, and THOMAS ROBERSON, and the CITY OF SOUTHLAKE, for violating her First, Fourth, and Fourteenth Amendment rights.

## I.

## PARTIES

1.      Plaintiff CONSTANCE WESTFALL is a Texas resident and resides in Tarrant County, Texas.

2.      Defendant JOSE LUNA is a police officer for the Southlake Police Department. He is sued in his individual capacity, and may be served at the Southlake Police Department, 600 State St, Southlake, Texas 76092. He was acting under color of law at all relevant times. *Service is hereby requested at this time.*

3.      Defendant NATHANIEL ANDERSON is a police officer for the Southlake Police Department. He is sued in his individual capacity, and may be served at the Southlake Police Department, 600 State St, Southlake, Texas 76092. He was acting under color of law at all relevant times. *Service is hereby requested at this time.*

4.      Defendant CHRIS MELTON is a police officer for the Southlake Police Department. He is sued in his individual capacity, and may be served at the Southlake Police Department, 600 State St, Southlake, Texas 76092. He was acting under color of law at all relevant times. *Service is hereby requested at this time.*

5.      Defendant THOMAS ROBERSON is a police officer for the Southlake Police Department. He is sued in his individual capacity, and may be served at the Southlake Police Department, 600 State St, Southlake, Texas 76092. He was acting under color of law at all relevant times. *Service is hereby requested at this time.*

6.      Defendant VENESSA TREVINO, at the time of the incident, was a police officer for the Southlake Police Department. She is sued in her individual capacity, and may be served at the Southlake Police Department, 600 State St, Southlake, Texas 76092. She was acting under color of law at all relevant times. *Service is hereby requested at this time.*

7.      Defendant, THE CITY OF SOUTHLAKE, is a Texas municipality incorporated under the laws of the State of Texas, who pursuant to Section 17.024(b) of the Civil Practices and Remedies Code, may be served by service of citation on the City of Southlake's City Manager, Shana K. Yelverton, 1400 Main Street, Suite 460, Southlake, Texas 76092.  *Service is hereby requested at this time.*

**PLAINTIFF'S ORIGINAL COMPLAINT**

## II.

## JURISDICTION AND VENUE

8.      As this suit is brought pursuant to 42 U.S.C. § 1983, this Court has federal question jurisdiction.  This Court has general personal jurisdiction over Defendants as they reside and/or works within the Fort Worth Division of the Northern District of Texas.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to Plaintiff's claims occurred in Tarrant County, Texas, which is within the Northern District and Fort Worth Division.

## III.

## FACTS

### SICK MOM GETS RUDE AWAKENING DURING HER SON'S SLEEPOVER

10.      The evening of Friday, January 10, 2014, Constance Westfall worked to prepare for an out-of-town business meeting for which she was leaving on Sunday.  Ms. Westfall was not feeling well, and had worked from home the preceding two days rather than going into her downtown Dallas law office.  Her son had five of his friends over for a Star Wars marathon sleep over in the game room upstairs.  All of the boys were high school freshman.

11.      Ms. Westfall went to bed and was awoken around 2:00 a.m. by the sound of banging.  She got up, thinking it was the boys, and walked to the garage door.  Ms. Westfall then realized that the banging was behind her, at the front door.  She opened the door, noticing that the night was bitterly cold.  Instead of the boys, a woman announced that she was with the Southlake Police Department.  The woman asked Ms. Westfall if she had a son, adding that they wanted to speak to him about criminally trespassing on the house next door.  Ms. Westfall asked which house, and told the woman that her son's best friend lived in that house.  The woman

asked Ms. Westfall to get her son.  Ms. Westfall closed the door and went back to the bedroom to get her glasses.  (Ms. Westfall is legally blind without her glasses.)

12.     As Ms. Westfall looked for her glasses, the phone rang twice in short succession. Unbeknownst to Ms. Westfall, her husband, Monte Westfall, who was asleep in an upstairs bedroom, answered the phone.  No one responded.  Mr. Westfall, thinking it was a crank call with all the teenagers in the house, hung up.  When the phone rang again, the son answered and was told by the Southlake police to come outside.  The son and one of his friends, Boy 1, went outside.  Boy 1 was asked by the officers to go into the house and retrieve Boy 2.  Boy 1 did so and then asked if he could leave.  The police officers told him he could not.  By asking their birthdays, the officers established that the boys were minors.   All three of the boys were barefoot, in athletic shorts, and short-sleeved t-shirts.

## WESTFALL STRUGGLES TO LOCATE GLASSES AND SON

13.     Ms. Westfall, continuing to look for her glasses, heard voices.  She pulled on some boots, grabbed a short coat to put over her night gown, and went outside.  Ms. Westfall was alarmed to hear a man and a woman interrogating the boys and threatening to take the boys to jail if the boys did not tell them where 'the marijuana' was.  Ms. Westfall told the woman and man at least twice that she could not find her glasses, and was legally blind without them.  The woman and man responded by accusing Ms. Westfall of slamming the door in their faces.  Ms. Westfall, mystified, explained that she had not slammed the door; she shut the door because it was freezing cold outside.

14.     Unbeknownst to Ms. Westfall, the two officers, Venessa Trevino, and Nathaniel Anderson, then agreed that they were not going to address Ms. Westfall anymore.

15.     The officers continued to interrogate the boys as if Ms. Westfall was not there, ignoring Ms. Westfall as she repeatedly asked who was there.

16.     Anderson, Trevino, and their supervisor, Corporal Jose Luna, refused to identify themselves.

17.     Ms. Westfall said, "I don't appreciate this.  I can't even see who you are."  As the officers continued to interrogate the boys, including her son, Ms. Westfall asked, "Why don't you come inside?  I can't see you at all.  I can't see who is out there."

18.     Trevino responded, "We can't come inside."

19.     Luna, Anderson, and Trevino failed to ensure equitable treatment of Ms. Westfall when she informed them she was legally blind.  In violation of the Americans with Disabilities Act, a federal civil rights law, Luna, Anderson, and Trevino chose to construe the actions of Ms. Westfall as uncooperative behavior, rather than the result of her disability.

20.     Mr. Westfall heard noises downstairs, got dressed, and saw his wife who told him she could not find her glasses.  After a search, Mr. Westfall found the glasses which were in the tangled covers of the bed, and brought the glasses to his wife.  Mr. Westfall then went to locate their Welsh Terrier, "Dexter," to put him into his crate.

21.     Ms. Westfall went outside and stood on her front porch.  Ms. Westfall saw two police officers, Trevino and Anderson, standing in front of the three shivering boys, who were sitting on a short brick wall by the front porch.

**OFFICERS GET ANGRY WITH MS. WESTFALL**

22.     Worried about the boys in the bitter cold, Ms. Westfall told the officers "Now I can see. Why don't you bring them all in?"  Anderson yelled, "We are not coming inside."

23.     Ms. Westfall pointed at Ms. Trevino in recognition, saying "I know you from the homeowners' association meeting."  Ms. Westfall has served on the homeowners' association board of directors for a number of years and the meetings are sometimes held at the Southlake Department of Public Safety, which houses both the Southlake Police Department and the Southlake Fire Department.

24.     Ms. Westfall was approached by Luna.  Luna told Ms. Westfall that he would fill her in if she would come away with him, to separate Ms. Westfall from her son and the other two boys.

25.     Ms. Westfall suggested to Luna that they stay and they could all figure out what was going on.  Luna became belligerent, told Ms. Westfall to "stop talking," and accused Ms. Westfall of interfering with the investigation.  Ms. Westfall asked Luna why he was being so rude.  Unbeknownst to Ms. Westfall at the time, Luna announced to Anderson and Trevino that he was not going to "cooperate" with Ms. Westfall.

26.     When Ms. Westfall answered one of the Trevino's questions about the ownership of the house next door, Luna barked at Ms. Westfall to be quiet.

27.     Luna yelled that he was going to order Ms. Westfall to go back into the house if she spoke again.

28.     By ordering Ms. Westfall not to speak, Luna illegally infringed Ms. Westfall's exercise of her First Amendment right to question suspect police action on her own front porch.

29.     Luna, Trevino, and Anderson evidenced that they were not interested in obtaining the facts from Ms. Westfall.  Luna, Trevino, and Anderson were irritated that Ms. Westfall had interrupted their custodial interrogation of her son and the other two boys in the freezing cold.

30.     Mr. Westfall came out of the house.  Luna pulled Mr. Westfall to the side by the front door and engaged him in conversation to separate Mr. Westfall from his son.

31.     Luna then rejoined the other officers.  Anderson asked Luna what they should do about the marijuana that the officers had told the boys that they "knew" was in the house.

32.     Luna responded that one of the boys could go get the marijuana and bring the marijuana back outside.

33.     Ms. Westfall's son said, "There is a little bit upstairs."

34.     Shocked and angry at her son, Ms. Westfall told her son to "go get it."

35.     Ms. Westfall's son got up and went into the house.

### K-9 OFFICER ENTERS HOME WITHOUT CONSENT OR WARRANT

36.     At this point in time, no officer requested oral consent of the Westfalls to enter the house.

37.     Likewise, no officer requested written consent of the Westfalls to enter the house.

38.     Rather, Anderson approached Mr. Westfall, who was still standing next to the front door, and ordered him to go in, while Anderson followed him.

39.     Mr. Westfall and Anderson went into the house and Mr. Westfall shut the door.

40.     At the time of Anderson's entry, the officers did not have a search warrant for the home.

41.     At the time of Anderson's entry, there was no suspicion that any person was in imminent danger of serious bodily injury.

42.     At the time of Anderson's entry, there was no exigent circumstances to justify the police entering and searching the Westfall's home.

43.     The officers did not obtain the consent of either Mr. or Ms. Westfall to enter and search their home.

44.     The consent of both Mr. and Ms. Westfall was required to enter and search their home.

45.      Mr. and Ms. Westfall were the ones to define the terms of any consensual search of their home, not the police.

**OFFICER LUNA SLAMS MS. WESTFALL TO THE GROUND WITHOUT CAUSE**

46.     Ms. Westfall, on the front porch, seeing her son and husband go into their home, turned to follow them.

47.     Luna appeared to her left and yelled, "You are not going anywhere.   You slammed the door in our face."

48.     Ms. Westfall responded "You have got to be kidding me" and again explained that she did not slam the door.

49.     Ms. Westfall told Luna she was going into her house.  She reached for the knob of her front door.

50.     Luna body-slammed Ms. Westfall to the ground. When he threw her, she landed in the corner of her brick porch by the door on her back. This impact caused severe injury to Ms. Westfall's back and body.

51.  Luna is reportedly 5 foot 9 inches, and 175 pounds.  Defendant maintains he runs and lifts weights five times a week.

52. Ms. Westfall stands 5 foot 5 inches, has a small build, and, was described by the officers, an "older female." As a partner in a national law firm, she has a sedentary work and private life.

53.     Besides causing injury, Luna's assault caused Ms. Westfall's nightgown to fly up, exposing her genitals, and in full view of Trevino and the two teenage boys.

55.     Ms. Westfall screamed "You're exposing me.   You're exposing me," and struggled to cover her nakedness.  Ms. Westfall found she could not.

56.     The fall further scraped Ms. Westfall's bare buttocks against the brick.

**OFFICERS SMOTHER MS. WESTFALL ON THE GROUND**

57.     While on her back, Luna pounced on top of her, crushing her torso with his body. Trevino likewise joined Luna in smothering her.   Writhing in pain, gasping for air, and stunned with shock and embarrassment, Ms. Westfall was totally immobile.

58.     Luna and Trevino then began to manufacture resisting arrest charges against Ms. Westfall, repeatedly saying to Ms. Westfall:

"Relax."

"Calm Down."

"Cooperate."

"Ready to stop?"

"Stop resisting."

59.     Trevino and Luna both knew that Ms. Westfall could not "resist" because Ms. Westfall was completely immobile, crushed underneath their bodies.

60.     Trevino and Luna made these statements solely to assist them in filing false resisting arrest charges against Ms. Westfall, and were not lawful orders to Ms. Westfall.

61.     Dazed and injured, Ms. Westfall said "You are on top of me" and "I can't move anything."   Ms. Westfall pleaded that she was not resisting, and repeatedly asked the officers

what they wanted her to stop doing.  Luna called the Southlake Police Department dispatch and told them that "We have one resisting."

62.     Luna sought to use his taser on Ms. Westfall, angrily screaming over and over and over, "Cooperate or I'm going to tase you," "Cooperate or I'm going to tase you."

63.     Again, Luna knew that Ms. Westfall was completely immobile, crushed underneath his body and Trevino's body.

64.     Mr. Westfall and his son came out of the house, interrupting Luna's plans to tase Ms. Westfall, and saving Ms. Westfall from having extremely painful blasts of electric current surge through her injured body.  Trevino told Mr. Westfall, "Stay right there, sir."

65.     Ms. Westfall repeatedly told Luna and Trevino that they were hurting her.  In response, Luna and Trevino intensified their assault, pressing down on her torso and, telling Ms. Westfall to "quiet down" when she repeatedly screamed in pain.

**FELLOW OFFICER CONFRONTS LUNA FOR SLAMMING MS. WESTFALL DOWN**

66.     After assaulting and smothering Ms. Westfall for at least five minutes, Luna and Trevino jammed Ms. Westfall's wrists into handcuffs and threw her into the back of Luna's police car.

67.     Another Southlake police officer, Chris Melton, arrived.  Luna and Melton opened the door of Luna's car.

68.     Angry, Luna grabbed at Ms. Westfall.

69.     Ms. Westfall shrunk back as far as she could and told Luna, "You hurt me.  I don't want you to touch me again.  I need medical attention. I want my husband to take me to the emergency room."

70.     Luna yelled over and over, "You aren't hurt."

71.     Ms. Westfall repeated that she needed medical attention.

72.     Melton asked how Ms. Westfall was injured.  Ms. Westfall pointed at Luna, "He threw me to the ground."  Luna said, "She was attempting to enter the residence."

73.     Melton responded, "It is her residence."

74.     Melton knew there was no legal or factual basis for seizing and arresting Ms. Westfall.  Melton did not stop or in any way try to prevent the violation of Ms. Westfall's civil rights.  Rather, Melton became a participant in the illegal actions, apparently with no concern for the rights of Ms. Westfall.

## OFFICERS CONCOCT SPURIOUS 'INTERFERENCE' CHARGE

75.     To cover up their obvious misconduct, the officers agreed to charge Ms. Westfall with "Interference with the Duties of a Public Servant."

76.     For the "Interference" charge, Luna first fabricated the story that he had told Ms. Westfall to "step back" from him, and instead of complying, Ms. Westfall "goes up behind me."

77.     When Luna completed his arrest affidavit for "interference with public duties," he told a new story.  Now Ms. Westfall was "running" toward Anderson to "attempt to push Anderson to the side."

78.     This account of the then 53-year-old woman "running" in her nightgown is made even more absurd since the parties were near each other in and about the enclosed front porch.

78.     Instead of ordering Ms. Westfall to step back from himself, Luna altered his account to say that he had ordered Ms. Westfall to step back from Anderson.

79.      Recognizing Melton's admonition that the law entitled Ms. Westfall to reenter her own home, Luna further embellished his tale, asserting that she "began to swing her arms in a fighting manner."

80.      Luna and the other officers knew at the time that they did not have any legal cause to arrest or detain Ms. Westfall. No reasonable officer would have believed Ms. Westfall was a danger, or could be a danger, to the officers at any relevant time.

81.      What is more is that Luna had no authority to employ *any* force against Ms. Westfall.

## OFFICERS PLANNED ANOTHER CHARGE AND INCIDENT

82.      The officers' violations did not end there, though.

83.      Luna and the other officers, including Melton, planned to provoke a fight with Ms. Westfall, so that they could tase Ms. Westfall and charge Ms. Westfall with assault on a peace officer.

84.      Accompanied by Melton, Luna approached Ms. Westfall in the police car for a second time.  Ms. Westfall was moaning in pain.  Luna said, "I'm going to try to talk to her a little bit. See if she'll fight me."

85.      Melton responded, "Might need a little tase too."  Ms. Westfall, in shock, dazed, cold, and injured, repeatedly asked the officers for medical assistance, unknowingly thwarting the officers' plans for further assault and a false felony criminal charge.

86.      To cover up the officers' obvious misconduct, the officers initially ignored Ms. Westfall's requests for medical assistance, told Ms. Westfall that she was not injured, and debated whether her injuries were "enough."

87.      Luna eventually called for medics.  To cover up the officers' obvious misconduct, Luna, and all of the other officers at the scene, failed to inform the medics of the method of Ms. Westfall's injury—of Luna's and Trevino's assault on Ms. Westfall—which delayed Ms. Westfall's medical treatment.

88.     One of the medics asked "Did you all actually throw her to the ground, or no?"

89.     Roberson disclaimed being there, but offered, "They wrestled her."

90.     The medic responded, "You know they should fess up."

91.     Luna did not "fess up."

92.     To cover up the officers' obvious misconduct, Luna's false arrest affidavit made no mention of an assault, takedown or any "defensive tactic" employed against Ms. Westfall.

93.     Instead, Luna's affidavit falsely stated that Luna grabbed Ms. Westfall's right arm and turned Ms. Westfall around, and within a minute Luna and Trevino had placed Ms. Westfall into double-locked handcuffs.

94.     Nowhere in Luna's sworn affidavit does he mention throwing Ms. Westfall to the ground, or the five-minute assault that occurred thereafter.

96.     Other officers arrived. None of these newly arrived officers appeared to do anything to investigate whether there was any legal or factual basis for seizing and arresting Ms. Westfall. None of these newly arrived officers stopped or tried to prevent the violation of Ms. Westfall's civil rights even though at least one of officers was suspicious, asking Luna:

"You all are having to wait to call a medic?"

"What are you arresting this girl for?"

"You just kinda grabbed ahold of her, right? A self-control technique?"

All of the officers thereby violated Ms. Westfall's civil rights.

97.     Luna was irritated at the officer's questions about Ms. Westfall, immediately afterwards saying to Trevino, "Got that on tape.  We've been tazing her into the cold."

**OFFICER: "I WAS AFRAID THAT YOU WERE REALLY GOING TO HURT HER"**

98.     Trevino responded, "I felt so bad.  We were up in the corner.  You were like …
your whole body was on her."  Trevino continued, "That's how harsh it seemed—putting that
much pressure on her.  I was afraid that you were to really hurt her.  I was looking at you
like 'Dude, I can't put the handcuffs on her.'"

99.     Luna attempted to defend his excessive force, asserting that he had only put "75
percent" or "50 percent" of his body weight on Ms. Westfall.

100.    Luna added sardonically, "I was doing my defensive tactics move."

101.    The City of Southlake had provided "Defensive Tactics" training to Luna,
Anderson, and Trevino the previous day.  Trevino knew there was no factual basis for seizing
and arresting Ms. Westfall, but instead of stopping the violation of Ms. Westfall's civil rights,
Trevino participated in the illegal actions, apparently with no concern for the rights of Ms.
Westfall.

102.    Ms. Westfall, still dressed only in her nightgown and short coat, was taken to the
emergency room for treatment of her injuries. Roberson accompanied Ms. Westfall to the
hospital. The medics asked Ms. Westfall for her occupation at which time Roberson learned that
Ms. Westfall was an attorney.

**K-9 OFFICER MISINFORMS PARENTS ABOUT MS. WESTFALL**

103.    The officers called the parents of the boys and escorted the boys to their parents
when their parents arrived.  When the parents of the boy who witnessed the assault on Ms.
Westfall arrived, Anderson took them aside and told the parents that he wanted to fill them in
before their son could put his "twist on things."  Anderson told the parents that:

- Ms. Westfall had been charged with assault on a police officer;

- Ms. Westfall fought the cops;

- Ms. Westfall fought the cops all the way to the police car;

- Ms. Westfall was going to jail; and

- It would not be a good idea for their son to come back to the Westfalls's house.

104.    Anderson also dissuaded the parents from speaking with Mr. Westfall.  To cover the officers' obvious misconduct, Anderson tampered with a witness to Ms. Westfall's assault by making what he knew to be false statements about Ms. Westfall to the witness' parents.

105.    When the Westfalls later contacted these parents to see if their son would be a witness in the criminal case against Ms. Westfall, the parents said that if the Westfalls contacted them again, the dad would come beat up Mr. Westfall.

106.    Anderson knew there was no factual basis for seizing and arresting Ms. Westfall, but instead of stopping the violation of Ms. Westfall's civil rights, Anderson participated in the illegal actions, apparently with no concern for the rights of Ms. Westfall.

107.    Around 4:00 a.m., Anderson told Mr. Westfall that he could have his home back. The Southlake Police Department had requisitioned Mr. and Ms. Westfall's home, with six or more police officers coming and going as they pleased throughout Mr. and Ms. Westfall's home.

**SOUTHLAKE POLICE OFFICERS GATHER TO LAUGH ABOUT THE ASSAULT**

108.    The officers then gathered in the street in front of the Westfall's home. Luna mimicked Mr. Westfall's shocked reaction to Luna's assault on Mr. Westfall's wife.  The other officers erupted in laughter.  The officers continued to laugh as Luna mocked the boys who had started crying during the assault on Ms. Westfall.

**PLAINTIFF GOES TO HOSPITAL THEN TO JAIL**

109.     Ms. Westfall was admitted into Baylor Medical Center at Grapevine where she was cursorily examined because she was in police custody.

110.     The hospital staff noted numerous abrasions and bruises, bloody urine, high blood pressure and heart rate.  The hospital informed Roberson of Ms. Westfall's diagnosis: abrasions, bruises, fracture, sprain, and strain, and the need for follow-up care and pain medication.

111.     Luna falsely stated in his affidavit that the "doctors advised that Ms. Westfall had no injuries."

112.     When Ms. Westfall was released from the hospital, Roberson took Ms. Westfall, still dressed only in her nightgown and short coat, to the jail where Ms. Westfall was imprisoned for interference with public duties.

113.     Roberson knew there was no factual basis for seizing and arresting Ms. Westfall, but instead of stopping the violation of Ms. Westfall's civil rights, Roberson participated in the illegal actions, apparently with no concern for the rights of Ms. Westfall.  Mr. Westfall bonded Ms. Westfall out the next day.

## MS. WESTFALL ENDURES INJURIES AND PHONY CRIMINAL CHARGE

115.     The Southlake Police Department then forwarded the false reports and the false affidavit to the Tarrant County District Attorney's office.

116.     Based on the false reports and false affidavit, the Tarrant County District Attorney's office brought charges against Ms. Westfall for interference with public duties.

117.     After hiring a criminal defense attorney, at considerable expense, the charges against Ms. Westfall were dismissed.  Indeed, Plaintiff incurred $10,000.00 in attorneys' fees in defense of the dismissed charge.

118.    Concurrent with having to combat the baseless criminal charge, Plaintiff was seeking treatment for her physical injuries.  Severe back pain arising from the body slam and smothering, led her to receive treatment.  To date, she has had therapy, and two rounds of injections.  An MRI has revealed that Plaintiff suffered a herniation to her L5-S1 level of her lumbar spine.  Her physician has recommended a spinal surgery, which Plaintiff is presently contemplating.

119.    Besides her severe back injury, Plaintiff suffered a number of bruises and abrasions to her wrists, arms, legs, and body.  With her left side radiculopathy, she cannot sit for lengthy periods of time, which has undermined her law practice where she is a firm partner.

120.    Though many of the external wounds have healed, Constance Westfall is internally scarred. She has had months of sleeplessness, nightmares, anxiety, and other mental suffering as result of these officers' lawlessness.

## IV.

## CAUSES OF ACTION

## A.

## DEFENDANTS LUNA, ANDERSON, TREVINO, ROBERSON AND MELTON

## FALSE ARREST

121.    The factual allegations contained in all of the paragraphs of this Complaint are hereby incorporated and re-alleged for all purposes and incorporated herein with the same force and effect as if set forth verbatim.

122.    Defendants had no probable cause or reasonable suspicion to arrest or detain Ms. Westfall.  In fact, Ms. Westfall never posed any threat to the Defendants or any other person.

**PLAINTIFF'S ORIGINAL COMPLAINT**

123.    No reasonable officer would have forcibly detained Ms. Westfall based on the facts available to the Defendants.

124.    Defendants deliberately fabricated an arrest affidavit and reports that caused Ms. Westfall to be charged with "interference with public duties." Defendants' actions were plainly incompetent.

125.    Defendants deliberately tampered with witnesses and evidence, causing Ms. Westfall to be charged with "interference with public duties." Defendants' action was plainly incompetent.  They likewise made several intentional, knowing or reckless statements of fact in reports, affidavits, or supplemental reports.  Each Defendant knew that others would rely on these reports, affidavits, or supplemental reports in rendering charging decisions.

126.    As a result, Defendants caused Ms. Westfall to be arrested on charges they knew were unsupported by the evidence, and failed to establish probable cause.  Defendants' detention and arrest violated Plaintiff's clearly established rights under the United States Constitution to be free from a seizure without probable cause.  Alternatively, they allowed one or more of the other officers to charge Ms. Westfall when they know such charges were baseless.  As a result, they violated their well-established duties to prevent another officer from violating an individual's rights.  *See Ware v. Reed,* 709 F.2d 345, 353 (5th Cir.1983).  As a direct and proximate result of Defendants' actions, Ms. Westfall suffered injuries.  Those injuries and damages include:

- mental suffering and embarrassment from her detention and arrest;

- having to post a $750.00 bond; and

- criminal defense attorneys' fees of $10,000.

**B.**

**DEFENDANTS LUNA, ANDERSON, TREVINO, ROBERSON AND MELTON**

## DENIAL OF MEDICAL TREATMENT

127.    The factual allegations contained in all of the paragraphs of this Complaint are hereby incorporated and re-alleged for all purposes and incorporated herein with the same force and effect as if set forth verbatim.  Following the assault on Plaintiff, all of the Defendants at various times obstructed Plaintiffs ability to receive medical attention.  At various times, one or more of the officers asserted that Plaintiff was uninjured, or had only minor injuries.  These statements were made to conceal, or otherwise deflect from the fallacious charges levelled against Plaintiff. As a result, Defendants individually and collectively caused the delay and denial of Ms. Westfall's medical treatment.

### DEFENDANT LUNA

### EXCESSIVE FORCE

128.    The factual allegations contained in all of the paragraphs of this  Complaint are hereby incorporated and re-alleged for all purposes and incorporated herein with the same force and effect as if set forth verbatim.

a.   Luna  willfully and maliciously threw Plaintiff to the ground, despite having no basis to do so;

b.   Luna then jumped onto Plaintiff's body, needlessly smothering her torso;

c.   Luna and Trevino needlessly continued to smother Plaintiff for several minutes;

d.   The force used by Luna was recklessly excessive and caused Plaintiff bodily injury;

e.   Luna tightened the handcuffs on Plaintiff so severely that her wrists were lacerated and bruised;

f.   Luna's acts caused Plaintiff several injuries, including

(1) an L5-S1 herniation of her lumbar spine;

(2) bruised ribs;

(3) lacerations and abrasions to her body and appendages; and

(4) contusions to her body and appendages.

## DEFENDANT TREVINO

## EXCESSIVE FORCE

129.   The factual allegations contained in all of the paragraphs of this Complaint are hereby incorporated and re-alleged for all purposes and incorporated herein with the same force and effect as if set forth verbatim.

130.   After Defendant Luna slammed Ms. Westfall to the ground, and began to smother her, Defendant Trevino disregarded her obligations to Ms. Westfall, and did nothing to prevent Luna from violating Plaintiff's rights.  *See Ware, supra*.

131.   Rather than prevent Plaintiff's further injury, Defendant Trevino assisted her co-defendant, and helped smash and smother Plaintiff's body against the ground.

132.   Trevino helped cause or aggravate Plaintiff's injuries caused by Defendant, including her L5-S1 lumbar herniation; bruised ribs; lacerations and abrasions to her body and appendages; and contusions to her body and appendages.

## DEFENDANT LUNA

## FREEDOM OF SPEECH

133.   The factual allegations contained in all of the paragraphs of this Complaint are hereby incorporated and re-alleged for all purposes and incorporated herein with the same force and effect as if set forth verbatim.

134.   The First Amendment includes the freedom of individuals to verbally oppose or

challenge police action, and is one of the principal characteristics by which we distinguish a free nation from a police state.

135.    Defendant Luna acted willfully, deliberately, maliciously, or with reckless disregard of Ms. Westfall's clearly established rights protected by the First Amendment.

136.    Furthermore, it is well established that a person may not be charged with Interference with a Duty of a Public Servant simply by exercising free speech.  This right had been clearly established within the Fifth Circuit for several years before this incident.  *Freeman v. Gore,* 483 F.3d 404 (5th Cir. 2007) *citing Carmey v. State,* 31 S.W.3[rd] 392, 394, 398 (Tex. Crim App. 2000); Tex. Pen. Code § 38.15.

137.    Defendant Luna was angry that Ms. Westfall had attempted to participate in the conversation involving her son and his guests.  Defendant, in essence, lashed out at the lawyer, who, standing on her own front porch, had every right to inquire as to what was taking place. What is more is that when the subject of the marijuana came up, Ms. Westfall actually directed her son to retrieve it for the officers.  In short, she assisted the officers in seizing "the contraband" they desired, wholly contrary to the charge of Interference.  What is more is that the officers, discovering that the unlawful late night search yielded only about 2.5 grams of marijuana—barely two joints—did not charge any of the five boys with a criminal offense.

## THE CITY OF SOUTHLAKE

138.    The factual allegations contained in all of the paragraphs of this  Complaint are hereby incorporated and re-alleged for all purposes and incorporated herein with the same force and effect as if set forth verbatim.

139.    The City of Southlake police department failed to train and supervise the individual defendants concerning constitutionally permissible searches, seizures, and uses of

force, despite knowing that officers would repeatedly be placed in situations where such training was essential to prevent civil rights violations.

140.     Specifically, the City of failed to train or adequately train the officers  regarding:

    (1)     Interacting with persons with disabilities;

    (2)     Ability of individuals verbally to oppose or challenge police action;

    (3)     Identifying suspects sufficiently to establish probable cause and or reasonable suspicion sufficiently for a search or arrest;

    (4)     Searches and seizures of subjects who are not suspects or otherwise under;

    (5)     Arresting a non-resisting subject without causing needless bodily injury;

    (6)     Entering into citizens' homes absent exigent circumstances and/or absent consent or a valid search warrant; and

    (7)     Inappropriate use of "defensive tactics," as alleged by Defendant Luna.

141.     Each of the policies delineated above was actually known, constructively known and/or ratified by the City of Southlake, and its policymakers, delegated to chief of police and his designees.  These policies, or lack thereof, and customs, whether written or unwritten, were promulgated with deliberate indifference to Plaintiff's rights under the United States Constitution.

142.     Moreover, the known and obvious consequence of these policies was that City of Southlake police officers would be placed in recurring situations in which the constitutional violations described within this complaint would result. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

143.    Consequently, the policies delineated above were a moving force of Plaintiff's constitutional deprivations and injuries, and caused Ms. Westfall's injuries.

## V.

## DAMAGES

144.    Plaintiff sues for the following damages:

a.    Reasonable medical care and expenses in the past;

b.    Reasonable and necessary medical care and expenses which will in all reasonable probability be incurred in the future;

c.    Loss of earnings in the past;

d.    Loss of earning capacity which will, in all probability, be incurred in the future;

e.    Physical pain and suffering in the past;

f.    Physical pain and suffering in the future;

g.    Mental anguish in the past;

h.    Mental anguish in the future;

i.    Physical impairment in the past;

j.    Physical impairment which, in all reasonable probability, will be suffered in the future;

k.    loss of reputation, shame, embarrassment, humiliation in the past;

l.    loss of reputation, shame, embarrassment, humiliation in the future; and

m.    past expenses for criminal defense, including $10,000.00 in reasonable attorneys' fees.

## VI.

## EXEMPLARY DAMAGES

145.    Plaintiff would further show that the acts and omissions of Defendants complained of herein were committed with malice or reckless indifference to the protected rights of the Plaintiff.   In order to punish said Defendants for engaging in unlawful vicious attacks, and to deter such actions and/or omissions in the future, Plaintiff also seeks recovery from all Defendants for exemplary damages.

## VII.

## ATTORNEYS' FEES AND JURY DEMAND

146.    Plaintiff is further entitled to receive reasonable attorneys' fees, paralegal fees and expert fees and costs pursuant to 42 U.S.C. § 1988. Plaintiff respectfully demands that a jury be empaneled to hear this action.

## VIII.

## CONCLUSION

Plaintiff, Constance Westfall, respectfully urges that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendants for damages in an amount within the jurisdictional limits of the Court; exemplary damages, together with interest as allowed by law; costs of court; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

Respectfully submitted,

**HENLEY & HENLEY, P.C.**


By:  */s/ Geoff J. Henley* _____
Geoff J. Henley
Texas Bar No. 00798253
ghenley@henleylawpc.com
R. Lane Addison
Texas Bar No. 24059355
rladdison@henleylawpc.com
3300 Oak Lawn Avenue, Suite 700
Dallas, Texas  75219
Tel. (214) 821-0222
Fax. (214) 821-0124
**ATTORNEYS FOR PLAINTIFF,
CONSTANCE WESTFALL**